# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-DP-01316-SCT

*KELVIN JORDAN, a/k/a KELVIN L. JORDAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/01/96 |
| TRIAL JUDGE: | HON. ROBERT WALTER BAILEY |
| COURT FROM WHICH APPEALED: | CLARKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES N. POTUK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND VACATED IN PART - 11/19/98 |
| MOTION FOR REHEARING FILED: | 12/4/98 |
| MANDATE ISSUED: | |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. Kelvin Jordan was indicted during the February 1996 term of the Circuit Court of Clarke County in a three count indictment: two counts for capital murder and one count for armed robbery. Count I of the indictment charged that on October 5th, 1995, Kelvin Jordan and Frontrell Edwards shot and killed Codera Bradley while engaged in the commission of an armed robbery, in violation of Miss. Code Ann. § 97-3-19(2)(e). Count II charged that on October 5th, 1995, Kelvin Jordan and Frontrell Edwards shot and killed Tony Roberts while engaged in the commission of an armed robbery, in violation of Miss. Code Ann. § 97-3-19(2)(e). Count III of the indictment, the armed robbery count, charged that Kelvin Jordan and Frontrell Edwards wrongfully took possession of a 1992 Nissan belonging to Tony Roberts in violation of Miss. Code Ann. § 97-3-79 . Jordan was tried by jury and was found guilty of all three counts on October 30, 1996.

¶2. Thereafter, the jury heard evidence and arguments in aggravation and mitigation of the sentence to be imposed. The jury returned a sentence of death for both capital murder counts on October 31, 1996. The jury's verdict reads as follows:

As to Count I

We, the Jury, unanimously find from the evidence, beyond a reasonable doubt, that the following facts existed at the time of the commission of the capital murder under Count I:

1. The defendant intended that the killing of Codera Bradley take place, and

2. The defendant contemplated that lethal force would be employed.

Next, we, the Jury, unanimously find that the aggravating circumstances of:

1. The capital offense was committed while the Defendant was engaged in the crime of robbery. And

2. The capital offense was committed with the purpose of avoiding arrest. And

3. The capital offense was especially heinous, atrocious or cruel.

are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances and we unanimously find that the Defendant should suffer death under Count I.

/s/ Kathy Hunter

Foreman of the Jury

As to Count II

We, the Jury, unanimously find from the evidence, beyond a reasonable doubt, that the following facts existed at the time of the commission of the capital murder under Count II:

1. That the defendant attempted to kill Tony Roberts

2. That the defendant intended that the killing of Tony Roberts, take place, and

3. The defendant contemplated that lethal force would be employed.

Next, we, the Jury, unanimously find that the aggravating circumstances of:

1. The capital offense was committed while the Defendant was engaged in the crime of robbery and

2. The capital offense was committed with the purpose of avoiding arrest, and

3. The capital offense was especially heinous, atrocious or cruel.

are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances and we unanimously find that the Defendant should suffer

death under Count II.

/s/ Kathy Hunter

Foreman of the Jury

¶3. Jordan was sentenced to death by lethal injection. His execution has been stayed pending appeal. Jordan raises eight (8) assignments of error for appellate review:

**I. THE TRIAL COURT ERRED IN ADMITTING PHOTOGRAPHS OF THE VICTIMS' BODIES AT THE CRIME SCENE AND AUTOPSY PHOTOGRAPHS OF CODERA BRADLEY.**

**II. THE TRIAL COURT ERRED IN FINDING THAT THE DEFENDANT HAD NO STANDING TO CONTEST THE SEARCH OF THE AREA SURROUNDING THE CO-DEFENDANT'S TRAILER.**

**III. THE TRIAL COURT ERRED WHEN IT ALLOWED SHERIFF CROSS TO TESTIFY DURING THE SENTENCING PHASE OF TRIAL CONCERNING THE CONFESSION OF FRONTRELL EDWARDS THEREBY PREVENTING THE DEFENSE FROM CROSS EXAMINING THE CO-DEFENDANT FRONTRELL EDWARDS, VIOLATING THE DEFENDANT'S CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESS AGAINST HIM.**

**IV. THE TRIAL COURT ERRED WHEN IT ALLOWED THE PROSECUTION TO CROSS-EXAMINE JORDAN'S MOTHER REGARDING HER SON'S YOUTH COURT RECORD DURING THE SENTENCING PHASE OF TRIAL.**

**V. THE TRIAL COURT ERRED IN GRANTING THE JURY INSTRUCTION THAT MITIGATION EVIDENCE MUST OUTWEIGH THE AGGRAVATION EVIDENCE, THEREBY SHIFTING THE BURDEN OF PROOF TO THE DEFENDANT.**

**VI. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S REQUEST FOR A MERCY INSTRUCTION.**

**VII. THE TRIAL COURT ERRED IN ADMITTING A PHOTOGRAPH OF THE VICTIMS TAKEN BEFORE THEIR DEATH.**

**VIII. THE IMPOSITION OF THE DEATH PENALTY AGAINST JORDAN IS DISPROPORTIONATE AND EXCESSIVE CONSIDERING THE MITIGATING EVIDENCE CONCERNING THE ACCUSED.**

## STATEMENT OF FACTS

¶4. On the evening of Thursday, October 5, 1993 Tony Roberts went to visit his two year old son, Codera Bradley, in Pachuta, Mississippi. Codera's mother allowed the child to spend the night with his father. At about 9:15 p.m. Roberts and Codera left the house and drove towards Roberts' home.

¶5. At about 8:00 p.m. on the same evening Kelvin Jordan and his friend Frontrell Edwards walked to a

truck stop in Patchuta. Jordan was armed with a .25 caliber pistol; Edwards carried a .22 caliber pistol. During their journey to the truck stop, they discussed the possibility of "jacking" or robbing someone that night to get money to go to a ball game. Jordan was concerned about being identified by the victim, but Edwards responded that he would simply kill the victim following the incident.

¶6. Jordan and Edwards arrived at the truck stop and waited. Shortly thereafter, Tony Roberts pulled into the truck stop. Edwards approached Roberts' car and asked if he and Jordan could have a ride. Roberts agreed and pulled his son into his lap. Jordan sat in the front passenger seat and Edwards climbed into the back seat behind Roberts. They traveled down Highway 11 until they reached Barnett Crossing, at which point Roberts told his passengers he could not take them farther. Roberts pulled the car onto the side of the road to let them out. Edwards then reached from the back seat and shot Roberts in the side of the face with a .22 caliber pistol. Roberts remained conscious, crawled out of the car, and told Jordan and Edwards they could have the car. Roberts was standing on the side of the road clutching his head when Jordan fired additional shots toward Roberts with the .25 caliber pistol. Roberts then fell to the ground. Jordan claims he does not know whether the shots he fired struck Roberts at that time.

¶7. Edwards dragged Roberts across the highway to allow an oncoming car to pass. After searching Roberts' pockets and complaining that Roberts had no money, Edwards dragged Roberts back to the car and placed him in the trunk. Jordan drove the car approximately one mile down the highway and exited onto a logging road where they stopped the car and took Roberts from the trunk. When Roberts began to kick and flinch Jordan fired another shot at Roberts with a .380 caliber pistol he had found between the seats in Roberts' car. After removing Roberts' shoes, Edwards dragged the body down a path into the woods. Jordan remained at the vehicle with Codera Bradley.

¶8. When Edwards returned from the woods he reached into the back seat of the car, firmly grasped Codera's head, and pulled the child into the front seat of the car. He then asked the child if he wanted to go to where his daddy was, at which time the child began to frantically cry and scream. Covering the child's mouth with his hand, Edwards led Codera into the woods where the body of his father was located, and fired one lethal shot into the back of Codera's head. Edwards then turned and fired one last shot at Roberts before he reemerged from the woods.

¶9. Edwards and Jordan drove Roberts' Nissan to a dirt pit away from the road . After removing the car's stereo equipment along with some car care products, they ignited the automobile and left the scene. Jordan tossed Roberts' .380 pistol into a nearby pond, while Edwards threw in the clip. Edwards later gave his mother the .22 pistol. The .25 pistol was left in the bucket of car care products taken out of Roberts' car.

¶10. The following day, Tony Roberts and Codera Bradley were reported missing. On Saturday, two days after the murders, two acquaintances of Edwards, Mark Holloway and Tracy Nicholson, went to Edwards' trailer in search of Holloway's pager. In the back bedroom of the trailer they noticed guns and pieces of electronic equipment (a car stereo, speakers, etc.). Holloway later called the wife of a deputy sheriff and told her what they had observed in the trailer.

¶11. On Sunday afternoon, the Jasper County Sheriff's Department received a call concerning a burned vehicle in a dirt pit located in the Rose Hill area. The serial number from the car indicated it belonged to Roberts. Upon inspection, the deputy noticed that the radio had been removed from the car. Based upon the phone call to the deputy's wife, a warrant was obtained to search Edwards' trailer.

¶12. While searching the trailer, one of the officers noticed an orange object in the woods behind the trailer. He followed a path leading into the woods and discovered that the orange object was a chainsaw. A plastic bucket containing car care products, a .25 caliber pistol, and some loose .380 rounds of ammunition was also discovered. The bucket and accompanying products were later identified as products similar to those which Roberts had kept in his vehicle.

¶13. The items found in the woods were seized and Jordan was arrested on October 10, 1995. Jordan subsequently confessed his involvement in the murders to Deputy Sheriff Riley and the investigator for the Highway Patrol, Raymond Delk. Jordan then provided additional statements to Sheriff Cross and Deputy J.G. Kufel.

¶14. Following his confession, Jordan took Deputy Sheriff Riley and Officer Delk to the site in Clarke County where the bodies of Tony Roberts and Codera Bradley were located. The bodies were found lying next to each other. Tony Roberts suffered two gunshot wounds: one wound entered below the right eye and exited through the left eye; the other entered the left temple above the left ear and exited from the right ear. The latter wound was lethal. The child had been shot once in the back of the head with the bullet exiting above the upper lip. He was still clutching a small package of toys.

¶15. Jordan provided information enabling the officers to recover the .380 pistol from the pond and the .22 pistol from Edwards' mother. A projectile fired from the .380 pistol was found in a pool of blood where Jordan stated Roberts was pulled from the trunk on the logging road. A cartridge casing which was also found at the scene bore class characteristics of the .380. Finally, a cartridge casing found near the foot of Codera Bradley which also bore the characteristics of the .380 pistol found in the pond.

## DISCUSSION OF THE ISSUES

## I. THE TRIAL COURT DID NOT ERR IN ADMITTING PHOTOGRAPHS OF THE VICTIMS' BODIES AT THE CRIME SCENE OR AUTOPSY PHOTOGRAPHS OF THE MINOR VICTIM.

¶16. Jordan asserts the trial court violated Rules 401 and 403 of the Mississippi Rules of Evidence in allowing the introduction of certain photographs into evidence. He contends that under Rule 401, such pictures were irrelevant and therefore should not have been admitted. Jordan also contends the probative value of the photographs is substantially outweighed by the prejudicial effect, and consequently should have been excluded under Rule 403.

¶17. In the recent case of *Holland v. State,* we reiterated the standard of review concerning the admissibility of photographs. "Photographs are admissible in the discretion of the trial court, and this Court will not reverse absent an abuse of discretion." *Holland v. State*, 705 So.2d 307, 350 (Miss. 1997) (*citing Givens v. State*, 618 So.2d 1313, 1317 (Miss. 1993)). Further, "'Some 'probative value' is the only requirement needed to buttress a trial judge's decision to allow photographs into evidence.'" *Holland*, 705 So.2d at 350 (*quoting Parker v. State*, 514 So.2d 767, 771 (Miss. 1986), *cert. denied*, 485 U.S. 1014 (1988)). In determining whether the jury should be allowed to view the photographs, the court should consider: (1) whether the proof is absolute or in doubt as to the identity of the guilty party, and (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury. *McNeal v. State*, 551 So.2d 151, 159 (Miss. 1989).

¶18. Before admitting the photographs the trial court, at Jordan's request, held a hearing on admissibility outside the presence of the jury. Defense counsel objected to the admission of photographs marked as Exhibits 22 through 28 on the grounds of prejudicial effect and relevance.

¶19. The court first addressed Exhibit 26, which depicts the bodies of Tony Roberts and Codera Bradley lying in the woods as they were found by the officers. It then reviewed the photographs marked as Exhibits 22 and 23, both of which are pictures of Tony Roberts as found in the woods. Specifically, Exhibits 22 and 23 are facial shots which illustrate the precise location of entry and exodus of the bullets. The court deemed these three photographs admissible.

> BY THE COURT: All right. The Supreme Court has ruled in many cases dealing with the admissibility of photographs. With respect to Exhibit Number 26, 22, and 23 that have been marked for identification purposes only -- specifically with Exhibit 26 for Identification only, it shows the condition of the victims immediately after the incident. There's testimony that the bodies had not been moved by anyone prior to this witness making these photos. Second, they corroborate the testimony of the witness as to the placement of the bullet holes found in the victims. That's 22 and 23. It shows the extent of the head injuries suffered by the victims. They are corroborative of the witnesses' testimony in this regard. The Court finds that although they are prejudicial, that they are more probative of the legal issues in this case than being unfairly prejudicial.

¶20. An important legal issue to which the trial judge refers is whether the murders occurred during the commission of a robbery. This threshold determination must occur in order for these murders to rise to the level of capital offenses. Only then may the penalty of death be imposed. Melissa Schoene, a forensic scientist who investigated the crime scene, testified that Tony Roberts was found with his pockets turned inside out and his shoes missing. Exhibit 26 clearly depicts these observations and is probative of the issue of whether Tony Roberts was robbed by the defendants.

¶21. Another important legal issue which must be proven is whether Jordan actually shot Tony Roberts. Jordan confessed that he fired shots at Tony Roberts but does not know whether the shots struck the victim. This is a question of fact for the jury. The photographs of Tony Roberts, specifically Exhibits 22 and 23, evidence the existence of more than one entry wound and are therefore probative of Jordan's participation in the murders.

¶22. The trial judge next examined Exhibit 24, which shows a projectile on the ground with a ruler beside it; and Exhibit 25, which depicts blood stains on the highway where Tony Roberts was initially shot. The judge ruled both photographs admissible, stating they were corroborative of the witnesses' prior testimony and were not prejudicial in any way.

¶23. Finally, the court addressed Exhibits 27 and 28, both of which are autopsy photos taken of Codera Bradley. Exhibit 27 clearly shows the entrance wound to the back of the child's head. The exit wound located above Codera's mouth is shown in Exhibit 28. As to these photographs, the trial judge determined as follows:

> BY THE COURT: Well, upon examining these photos, it's the Court's opinion that they are not unduly greusome [sic]. Autopsy reports have been ruled inadmissible when they have showed mutilation of body parts. This is not what I am looking at. These are -- will be just corroborative of, again, how this act occurred. It is prejudicial, but it is not more prejudicial than probative. Of course,

the case is if it's more probative than unfairly prejudicial to the defendant. I don't think it is. It is relevant.

¶24. It is Jordan's position that the jury should not have been exposed to these photographs due to their prejudicial nature. This Court bears the responsibility of reviewing the findings of the trial judge concerning admissibility, and it is clear that the judge in this case closely reviewed the evidence and carefully weighed the probative value of the evidence against its potential of prejudicing the defendant by inflaming minds of the jury. After a careful review of the photographs in question, we conclude that the trial judge was correct in finding "some 'probative value'" in each of these photographs. *Holland v. State*, 705 So.2d 307, 350 (Miss. 1997). Additionally, since the photographs were deemed necessary evidence to corroborate the testimony of the witnesses, the judge could conclude that the pictures were not offered as a "ploy" on the part of the prosecutor to arouse the passion and prejudice of the jury. *McNeal v. State*, 551 So. 2d 151, 159 (Miss. 1989). These findings are sufficient to uphold the ruling of the lower court. Thus, we find no Rule 403 violation on this point.

¶25. Jordan's second argument concerns the relevance of the photos. The lower court heard witness testimony concerning the injuries of the victims, specifically relating to the placement of the gunshot wounds. During the hearing on admissibility, the judge noted that the photographs in question were corroborative of such testimony and are therefore relevant. Exhibits 22, 23, 27, and 28 were used during trial to substantiate the testimony of Dr. Hayne, the physician who performed the autopsy. Likewise, the testimony of Melissa Schoene who investigated the crime scene at the time the bodies were discovered was supported by Exhibit 26, which displays the two bodies as they were found in the woods; Exhibit 25, showing the blood stains on the highway; and Exhibit 24, which depicts the projectile laying on the ground.

¶26. The comment to Rule 401 of the Mississippi Rules of Evidence on which Jordan relies states, "If the evidence has any probative value at all, the rule favors its admission." Miss. R. Evid. (401 cmt.). Again, it is clear from the record that the judge reviewed the photographs and determined they did in fact possess probative value, which is sufficient to support their admissibility. Therefore, the lower court did not abuse its discretion by allowing the photographs into evidence.

## II. THE DEFENDANT HAD NO STANDING TO CONTEST THE SEARCH OF THE AREA SURROUNDING THE CO-DEFENDANT'S TRAILER.

¶27. During an investigation pursuant to a valid search warrant, State Highway Patrol Investigator Raymond Delk seized a plastic bucket containing a .25 caliber pistol, car care products, and loose .380 rounds of ammunition. These objects were found in the woods approximately 100 feet from Frontrell Edwards' mother's trailer. Kelvin Jordan had been living there for over two weeks. Jordan filed a pretrial motion to suppress the evidence found by the officers claiming the area from which the objects were seized is part of the curtilage of the trailer; hence, the officers improperly seized the items in violation of his Fourth Amendment right to privacy.[1] The trial court held an extensive hearing on the matter and found the wooded area behind the trailer was not part of the curtilage of the trailer and Jordan had no standing to contest the search of the area. We concur with the trial court's finding.

¶28. The lower court relied on a four part test previously used by this Court in determining whether an area surrounding a structure is considered curtilage. *Arnett v. State*, 532 So.2d 1003, 1008-09(Miss. 1988) (citing the test set out in *United States v. Dunn*, 480 U.S. 294 (1987)). The four factors are as follows:

1. Proximity of the area claimed to be curtilaged to the home.

2. Whether the area is included within an enclosure surrounding the home.

3. The nature of the uses to which the area is put.

4. The steps taken by the resident to protect the area from observation by people passing by.

The United States Supreme Court stated that the test is not to be rigidly applied in all cases, but is to be used as an analytical tool in determining whether an area is so intimately tied to a home as to be within its curtilage. *Arnett*, 532 So.2d at 1009.

¶29. As this Court stated in **White v. State**, "'The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.'" **White v. State**, 571 So.2d 956, 959 n.2 (Miss. 1990)(*quoting* **Rakas v. Illinois**, 439 U.S. 128, 132 n.1 (1978)). Jordan must carry this burden in proving the four prongs of the "curtilage test" as set out in **Arnett**.

¶30. 1. *Proximity of the area.* Officer Delk conducted the search of the area in question. At the hearing, Delk testified that the area is approximately 100 feet from the trailer. In order to reach the area, it is necessary to walk down a sloping path, travel through a drainage ditch, and then enter the woods. Although 100 feet is in relatively close proximity to the trailer, the difficulty in reaching that distance is significant.

¶31. 2. *Enclosure.* There is no evidence that the wooded area is within an enclosure, such as a fence surrounding the home. Officer Delk testified, "There was some wire around with some posts in a little small area right there [in the woods]. [A]t one time there may have been a hog pen or some type pen." This apparatus may be narrowly considered to enclose the area where the pail was found, but our focus lies with whether a fence or other outward structure surrounded the house and land appurtenant to the house, which would define the area within as being curtilaged to the home. This evidence is not provided by the record.

¶32. 3. *Uses of the area.* According to Officer Delk's testimony, the area behind the trailer resembled a garbage dump. "[T]here was stuff all in the woods, different things, old things that had been there awhile." The objects in the woods were "scattered. . . just like you throw away stuff."

¶33. In *Arnett*, we defined the typical way in which the curtilage of a home is used: "'[T]he curtilage of a dwelling is a space necessary and convenient, habitually used for family purposes and for the carrying on of domestic employment; it is the yard, garden or field which is near to and used in connection with the dwelling.'" *Arnett*, 532 So. 2d at 1008 (*quoting* 68 Am.Jur.2d Searches and Seizures, § 20 (1973)). Jordan relies on this language, arguing the area was "near to and used in connection with" the trailer. *Id*. However, this argument is not persuasive when viewed in context with the foregoing sentence. It is not clear that the area at issue was used for anything at all except a place to abandon unwanted possessions. There is no indication that the property in question was habitually or even occasionally used for family purposes. Further, the area would not qualify as a yard, garden or field under traditional or familiar interpretations of these terms. In short, the usage of the property behind the trailer does not qualify as the type of use intended to designate the area as curtilage.

¶34. 4. *Steps taken by the resident to protect the area from observation*. There was no testimony at the suppression hearing concerning any steps made to protect the woods behind the trailer. The lower court

was made aware of no signs, structures, or coverings which would demonstrate a privacy interest in the property. Indeed, Officer Delk testified that while standing at the trailer, he saw an orange object in the woods. This object was later identified as a chainsaw lying in close proximity to the items seized. Therefore, it follows that anyone passing by the trailer would be able to see these objects in the woods as well. Other than the trees and underbrush naturally present in the area, it is evident that there were no active steps taken by any resident to protect the area from the view of any person merely passing by the property.

¶35. Jordan carried the burden of proof at the suppression hearing. In order to establish a privacy interest in the wooded area behind the trailer, Jordan must put on evidence at the suppression hearing which would convince the trial judge that in view of the four prong test the area could be considered curtilaged to the home. In light of the testimony at the suppression hearing, we conclude that Jordan had not met his burden of proof. The trial court's ruling that Jordan lacked standing to contest the search and seizure of the items in the woods was not erroneous.

### Ia. THE TRIAL COURT DID NOT ERR DURING THE SENTENCING PHASE WHEN IT ALLOWED SHERIFF CROSS TO TESTIFY CONCERNING THE CONFESSION OF FRONTRELL EDWARDS, AND THE DEFENDANT'S CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESS AGAINST HIM WAS NOT VIOLATED.

¶36. During the sentencing phase of the trial, the co-defendant, Frontrell Edwards, was placed on the witness stand for questioning by the defense. Edwards invoked his Fifth Amendment right against self incrimination, thereby refusing to answer counsel's questions. Charlie McCree, a jailmate of Frontrell Edwards, was then called to the stand by the defense. He testified that Edwards told him that he, rather than Jordan, had shot Tony Roberts and Codera Bradley on the night in question. He further testified that he believed Kelvin Jordan was against the killings[2].

¶37. The State then called Sheriff Kenneth Cross to the witness stand to testify concerning the contents of two confession statements made by Frontrell Edwards soon after his arrest. In his confession statements, Edwards asserted that it was initially Kelvin Jordan's idea to "jack someone" on the night in question; that Kelvin Jordan shot Tony Roberts; and that Kelvin Jordan shot Codera Bradley. Clearly, Edwards' confession statements to Sheriff Cross directly contradicted his statements made to Charlie McCree.

¶38. Jordan asserts the testimony of Sheriff Cross consisted of inadmissible hearsay which should have been excluded by the trial judge. He further claims the admission of Cross's testimony violated his right to confrontation under both the United States and Mississippi Constitutions. We disagree. The testimony of Sheriff Cross was properly admitted to impeach the credibility of Frontrell Edwards pursuant to Miss. R. Evid. 806, which provides in pertinent part:

> When a hearsay statement, or a statement defined in rule 801(d)(2), (C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness.

¶39. If the declarant, Frontrell Edwards, had testified as a witness for the defense, the State would then be permitted to cross examine Edwards or call another witness to the stand to attack Edwards' credibility. However, since Edwards was unavailable as a witness, the defense was allowed to introduce hearsay statements into evidence through the testimony of Charlie McCree. Miss. R. Evid. 804(b)(3). In

accordance with Rule 806, the trial judge then allowed the State to call Sheriff Cross in order to attack the credibility of the declarant as if the declarant had testified as to the prior statements. We find no error by the lower court in this respect.

¶40. Jordan asserts the admission of Edwards' statements by way of Sheriff Cross violates his constitutional right to confront the witness against him. The Confrontation Clause of the Sixth Amendment of the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Article 3, Section 26 of the Mississippi Constitution contains an almost identical provision. In *Lanier v. State*, 533 So. 2d 473 (Miss. 1988) we relied on the United States Supreme Court's interpretation of the confrontation clause, stating the purpose of the confrontation clause is fulfillment of the "'mission . . . to advance the accuracy of the truth determining process . . . by assuring that the trier of fact has a satisfactory basis for evaluating the truth of a prior statement.'" *Lanier*, 533 So. 2d at 488 (*quoting* Lafave and Israel Criminal procedure § 23.3(d) at 877-78 (1985)(*quoting California v. Green*, 399 U.S. 149 (1970))). Counsel for the defendant was aware that Frontrell Edwards was unavailable as a witness, but nevertheless placed Charlie McCree on the witness stand to introduce statements made by Edwards which favored the defendant. It is rationally inconsistent and constitutionally wanting for defense counsel to now argue that the subsequent introduction of Edwards' statements which disfavored the defendant was in violation of the defendant's right to confront Edwards though the defense opened the door with Charlie McCree's testimony. We find no error due to lack of cross-examination under the facts presented.

### IV. THE TRIAL COURT DID NOT ERR WHEN IT ALLOWED THE PROSECUTION TO CROSS-EXAMINE JORDAN'S MOTHER REGARDING HER SON'S YOUTH COURT RECORD DURING THE SENTENCING PHASE OF TRIAL.

¶41. During the penalty phase of trial, defense counsel placed Nannie Craft, Jordan's mother, on the witness stand to testify as to Jordan's peaceable character and model childhood. She stated that Jordan was always obedient, he never encountered problems at school, his reputation was that of peace, and he was generally quiet, well-mannered, and polite.

¶42. During cross-examination, Ms. Craft reiterated her belief that Jordan had never been in trouble with the law. The prosecution then asked Ms. Craft if her son had been charged with at least four crimes in the Jasper County Youth Court. Defense counsel objected, arguing the district attorney was using facts not in evidence. After further questioning, counsel again objected.

> BY MR. POTUK: Your honor, I want to object to this because, you know, we don't have anything to show that there was ever any adjudication of delinquency, no order or anything. All we are talking about are charges against someone. You know, that's all that this is, and I think this is prejudicial.

> BY THE COURT: Well, it's in response to her answers to questions that were asked. I understand they are not adjudications, but she is on cross-examination.

¶43. Defense counsel now argues that the prosecutor should not have been allowed to inquire into prior Youth Court matters because such matters may prejudice the jury's deliberations in the sentencing of the accused. We have previously allowed inquiry into prior juvenile records on cross-examination when introduced to rebut the opinion testimony of the mother of the accused. *Evans v. State*, 422 So.2d 737 (Miss. 1982). In *Evans*, we found no fault with a similar line of questioning because "no attempt was made

to introduce any adjudication order. Also, the questions asked were proper to test the recollection of the witness and were in rebuttal." Id. at 745. The present issue directly mirrors the *Evans* facts; therefore, we conclude the questioning was proper and did not prejudice the jury.

¶44. In addition, defense counsel alleges the admission of Jordan's prior encounters with youth court violates Rule 405(a) of the Mississippi Rules of Evidence which provides:

> In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant instances of conduct.

¶45. Counsel argues the youth court allegations could in no way be characterized as "specific instances of conduct", and therefore could not be inquired into on cross-examination. This argument is not well taken. Although no youth court adjudications were admitted into evidence, the incidents at issue include stealing various items from a grocery store, breaking and entering another's home in order to steal food and weapons, stealing a truck, and dropping out of school. Each of these is a specific instance of conduct which occurred in Jordan's past as contemplated by Rule 405(a). The prosecuting attorney did not inquire into these acts in order to prove that on the occasion in question the defendant acted in conformity with past behavior. Jordan's guilt had already been decided by the jury in the guilt phase of trial. These inquiries were made on cross-examination in order to impeach Ms. Craft's credibility. No substantive evidence was considered by the jury; therefore, the jury was not prejudiced by the information. The trial judge properly allowed the line of questioning pursuant to Rule 405(b) of the Mississippi Rules of Evidence.

## V. THE TRIAL COURT DID NOT ERR IN GRANTING THE MITIGATION EVIDENCE JURY INSTRUCTION.

¶46. Jordan next argues jury instruction C-2-S given during the penalty phase of trial improperly shifts the burden of proof to the defendant. The pertinent portions of the instruction read:

> Next, to return the death penalty under Count I and II, you must find that the mitigating circumstances - those that tend to warrant the less severe penalty of life imprisonment - do not outweigh the aggravating circumstances - those which tend to warrant the death penalty.
>
> \*\*\*
>
> You must unanimously find, beyond a reasonable doubt, that one or more of the preceding aggravating circumstances exist in this case to return the death penalty. If none of these aggravating circumstances are found to exist, the death penalty may not be imposed . . . .
>
> \*\*\*
>
> If one or more of the above aggravating circumstances is found to exist, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstances.

¶47. According to Jordan, the jury instruction improperly imposes on the defense the burden of overcoming a presumption that the death penalty should be imposed. Jordan cites no authority in support of his argument.

¶48. In *Williams v. State*, 684 So.2d 1179, 1201-02 (Miss. 1996), we addressed this issue. The disputed language quoted in *Williams* mirrors the language in question in the present case, and also, like the present case, Williams argued the instructions shifted the burden of proof from the prosecution to the defense. Relying on *Shell v. State*, 554 So.2d 887 (Miss. 1989), we rejected Williams' argument. In *Shell*, we quoted the language of the Fifth Circuit which had previously reviewed the Mississippi death penalty statute. Regarding the statute at issue, the Fifth Circuit proclaimed, "[e]very mandatory element of proof is assigned to the prosecution. Neither the burden of production nor the burden of proof ever shifts to the defendant." *Gray v. Lucas*, 677 F.2d 1086, 1106 (5th Cir. 1982), *cert. denied*, 461 U.S. 910 (1983). Consequently, we find no error in this instruction.

## VI. THE TRIAL COURT DID NOT ERR IN DENYING DEFENDANT'S REQUEST FOR A MERCY INSTRUCTION.

¶49. Jordan's next assignment of error involves the trial court's refusal to include a mercy instruction in the instructions to the jury. He contends the denial of the instruction amounts to a failure to properly instruct the jury that it was not required to sentence the defendant to death.

¶50. This Court has repeatedly held that "capital defendants are not entitled to a mercy instruction." *Underwood v. State*, 708 So.2d 18, 37 (Miss. 1998)(*citing Hansen v. State*, 592 So.2d 114, 150 (Miss. 1991); *Williams v. State*, 544 So.2d 782, 788 (Miss. 1987)); *Lester v. State*, 692 So.2d 755, 798 (Miss. 1997); *Jackson v. State*, 684 So.2d 1213, 1239 (Miss. 1996); *Carr v. State*, 655 So.2d 824, 850 (Miss. 1995); *Foster v. State*, 639 So.2d 1263, 1299-1301 (Miss.1994); *Jenkins v. State*, 607 So.2d 1171, 1181 (Miss. 1992); *Nixon v. State*, 533 So.2d 1078, 1100 (Miss. 1987)). The United States Supreme Court has held that giving a jury instruction allowing consideration of sympathy or mercy could induce a jury to base its sentencing decision upon emotion, whim, and caprice instead of upon the evidence presented at trial. *Saffle v. Parks*, 494 U.S. 484, 492-95 (1990). In light of the foregoing authority, we find the refusal to grant a mercy instruction does not amount to reversible error.

## VII. THE TRIAL COURT DID NOT ERR IN ADMITTING A PHOTOGRAPH OF THE VICTIMS TAKEN BEFORE THEIR DEATH.

¶51. The trial court admitted photos of Tony Roberts and Codera Bradley which were taken before their death. Photographs of the deceased in homicide cases are admissible "'so long as introduction of the photograph serves some legitimate, evidentiary purpose.'" *Walker v. State*, 671 So. 2d 581 (Miss. 1995) (*quoting May v. State*, 199 So. 2d 635, 640 (Miss. 1967)). Jordan argues there was no legitimate purpose for their introduction.

¶52. We have held that admitting a high school photograph of a victim prior to death is not an abuse of discretion. *Bullock v. State*, 391 So.2d 601, 609 (Miss. 1980). The photographs in this case were admitted for the legitimate purpose of identifying the victims. *See Evans v. State*, 422 So.2d 737, 743 (Miss. 1982). The contested photos were shown to one witness, Frankie Roberts, who is Tony Roberts' father and Codera Bradley's grandfather. Mr. Roberts was familiar with the appearance of the victims before their death, and testified the photos shown to him were accurate representations of the victims as they appeared before death. The trial judge did not abuse his discretion in admitting the pictures for the limited purpose of identification.

## VIII. THE IMPOSITION OF THE DEATH PENALTY AGAINST JORDAN IS NOT

## DISPROPORTIONATE OR EXCESSIVE CONSIDERING THE MITIGATING EVIDENCE CONCERNING THE ACCUSED.

¶53. In accordance with the mandate of Miss. Code Ann. § 99-19-105(3)(c)(1994), this Court "shall determine . . . [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Where the sentence is found to be disproportionate, this Court may "[s]et the sentence aside and remand the case for modification of the sentence to imprisonment for life." Miss. Code Ann. § 99-19-105(5)(b)(1994).

¶54. The case of *Davis v. State*, 684 So.2d 643 (Miss. 1996) provides sufficiently similar facts upon which a comparison of sentences may be made. Davis confessed to killing Linda Hillman in her trailer after she refused to give him money to buy drugs. He first shot Linda Hillman from behind, but the bullet did not kill her. After fifteen to twenty minutes, Davis then stabbed Linda Hillman to death because she had begun to scream. Linda Hillman was left lying on the bed in the trailer. On the following day, Davis called the police and confessed to the murder.

¶55. This scenario is not unlike that in which Kelvin Jordan was involved. Both cases involve murders committed in the course of robbery. Also, both involved innocent victims, but the present case involves the most innocent and helpless of victims -- a two year old child. The child's father, like Linda Hillman, did not die from the first shot. He left the car and told Jordan and Edwards they could have the car. Jordan and Edwards could have taken the car and left the scene at that point. However, Jordan and Edwards again shot Tony Roberts, and later dragged him into the woods and shot him once more. Edwards next led Codera Bradley into the woods and shot him once in the back of the head, instantly killing him. These murders took place simply because Kelvin Jordan and Frontrell Edwards wanted money to go to a ball game. They could have stolen the car while sparing the lives of Tony Roberts and his son, but they declined.

¶56. Doctor Reginald White, M.D. testified at the sentencing phase that it was his opinion that Kelvin Jordan could be easily dominated. However, nothing in the record indicates significant mental problems affecting Jordan. This evidence is not sufficient to indicate a lack of mental capacity or a lack of individual volition sufficient to shift individual responsibility to others.

¶57. After consideration of the accused, his crime, and his sentence in this case as compared to *Davis* and other death penalty cases, we find the sentence of death proportionate to sentences in like cases. Consequently, we affirm the jury's decision that Jordan should suffer death for the capital murders of Tony Roberts and Codera Bradley.

¶58. Although not assigned as error, we commend the State for confessing the issue of Jordan's inappropriate conviction of a separate armed robbery count along with the two counts of capital murder. Since armed robbery was the underlying felony in the capital murder charges, it was improper to also convict him of this same offense separately. We vacate the conviction and sentence for the armed robbery count in order to avoid multiple punishments for the same offense. *See Holly v. State*, 671 So. 2d 32, 45 (Miss. 1996)(*citing United States v. Buckley*, 586 F.2d 498, 505 (5th Cir. 1978), *cert. denied*, 440 U.S. 982 (1979) ("where a defendant is improperly convicted for a lesser included offense, the proper remedy is to vacate both the conviction and sentence on the included offense, leaving the conviction and sentence on the greater offense intact")).

## CONCLUSION

¶59. The assignments of error raised in this appeal with regard to the guilt and sentencing phases of Jordan's capital murder convictions are without merit. However, in light of Jordan's convictions of capital murder with armed robbery as an underlying offense, conviction on the armed robbery charge (Count III of the indictment) constitutes double jeopardy under the particular circumstances of this case. Therefore, we reverse and vacate the armed robbery conviction.

¶60. **COUNTS I AND II: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED. COUNT III: CONVICTION OF ARMED ROBBERY REVERSED AND VACATED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7)(SUPP. 1994) AND M.R.A.P. 41(a).**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, ROBERTS, SMITH AND WALLER, JJ., CONCUR.**

1. The trial court relied on *Minnesota v. Olson* in finding Jordan possessed a Fourth Amendment expectation of privacy in the trailer due to his status as a guest. *Minnesota v. Olson*, 495 U.S. 91 (1990). This privacy interest extends to the curtilage surrounding the trailer. *Walker v. United States*, 225 F.2d 447 (5th Cir. 1955). The issue raised is whether the area behind the trailer from which the objects were seized was within the curtilage of the trailer; if so, Jordan would have standing to contest the search of the area.

2. The testimony of Charlie McCree was deemed admissible by the trial judge as a statement against interest pursuant to Mississippi Rule of Evidence 804(b)(3). The declarant refused to testify on Fifth Amendment grounds, and was therefore unavailable as required by the Rules of Evidence. In addition, this Court has held that the U.S. Constitution requires that defendants be given broad latitude in introducing evidence of mitigating circumstances in the sentencing phase of trial. *Davis v. State*, 512 So.2d 1291, 1293 (Miss. 1987).