# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00662-COA

WALTER P. OKHUYSEN                                                    APPELLANT

v.

THE CITY OF STARKVILLE, MISSISSIPPI AND                           APPELLEES
D. LYNN SPRUILL

DATE OF JUDGMENT:              05/29/2020
TRIAL JUDGE:                   HON. LEE J. HOWARD
COURT FROM WHICH APPEALED:     OKTIBBEHA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        GARY GOODWIN
ATTORNEY FOR APPELLEES:        CHRISTOPHER JAMES LATIMER
NATURE OF THE CASE:            CIVIL - REAL PROPERTY
DISPOSITION:                   REVERSED AND RENDERED - 01/11/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., GREENLEE AND WESTBROOKS, JJ.

### WILSON, P.J., FOR THE COURT:

¶1.     Walter Okhuysen owns a vacant house and property on Garrard Road in Starkville. Following a public hearing, the Starkville Board of Aldermen adjudicated the property to be "in such a state of uncleanliness as to be a menace to the public health, safety and welfare of the community." Miss. Code Ann. § 21-19-11(1) (Rev. 2018). The Board's decision authorized the City to clean up the property if Okhuysen failed to do so himself and to assess Okhuysen for the cleanup costs and a penalty. *See id.* Okhuysen appealed the Board's decision to the circuit court, and the circuit court affirmed. On appeal, Okhuysen argues, inter alia, that the Board's decision must be reversed because it was based on a warrantless search of his property in violation of Article 3, Section 23 of the Mississippi Constitution.

For the reasons discussed below, we agree that the City's warrantless search of the property was unconstitutional and that the Board's decision must be set aside. Accordingly, we reverse and render the judgment of the circuit court and the Board's adjudication that the property is a public menace.

## FACTS AND PROCEDURAL HISTORY

¶2. In January 2019, Jeff Lyles, a code enforcement officer for the City of Starkville, went onto Okhuysen's vacant property on Garrard Road in Starkville without Okhuysen's permission and without a warrant. Lyles was investigating possible Code violations and took photographs of alleged Code violations. The photos show an abandoned truck and various other debris, junk, scrap materials, and construction materials scattered around the house and throughout a wooded area on the property. The photos also show overgrown vegetation around the house and the surrounding wooded area.

¶3. The City subsequently sent Okhuysen a letter notifying him in general terms that his property was in violation of section 94-27(d) of the City Code.[1] The letter stated that

---

[1] Section 94-27(d) provides:

(d) *Accumulations of refuse; noxious vegetation; unlawful dumping.* The existence of excessive accumulation or untended growth of weeds, undergrowth or other dead, or living plant life; or stagnant water, rubbish, garbage, refuse, debris, trash, including but not limited to household furnishings, and all other objectionable, unsightly or unsanitary matter upon any lot, tract, parcel of land, or the streets adjacent to the land, within the city be it uncovered or under open shelter, to the extent and in the manner that such lot, tract or parcel of land is or may reasonably become infested or inhabited by rodents, vermin or wild animals, or may furnish a breeding place for mosquitoes, or threatens or endangers the public health, safety or welfare, or may reasonably cause disease, or adversely affect and impair the economic welfare of adjacent property, or any other objectionable, unsightly substance

2

Okhuysen had ten days to bring the property into compliance with the City Code and warned that a failure to do so could result in a summons to appear in municipal court and fines, penalties, and other assessments.

¶4.     In March 2019, Lyles, in his official capacity, filed a complaint against Okhuysen in municipal court.  The complaint alleged that Okhuysen had unlawfully and willfully violated section 94-27(d).  The complaint quoted section 94-27(d) at length (*see supra* note 1) but made no specific allegations.  In June 2019, Lyles filed an amended complaint, adding a charge that Okhuysen had unlawfully and willfully violated chapter 54, article IV of the City Code, which, subject to certain exceptions, makes it unlawful and a misdemeanor to keep a "junked vehicle" on real property within the city limits.  In August 2019, following a trial, the municipal judge found Okhuysen guilty of ordinance violations and fined him $1,000.

---

or material tending by its existence and/or accumulation to endanger or adversely affect the health, safety, lives and/or welfare of the citizens of the city, is hereby prohibited and declared to be a public nuisance and unlawful.

It shall be unlawful for any person to cause or permit junk, scrap metal, scrap lumber, wastepaper products, discarded building materials, or any abandoned parts, machinery or machinery parts, garbage, trash or other waste materials to be in or upon any yard, garden, lawn, outbuildings or premises owned, rented, leased or otherwise occupied by him/her in the city unless in connection with a business enterprise lawfully situated and licensed for the same.

It shall be unlawful for the owners or occupants of any land or premises in the city to permit the excessive growth of weeds and other noxious plants on the land.

It shall be unlawful for any person to cause or permit dumping of refuse, waste, trash or garbage on abandoned or vacant property anywhere in the city unless the site has been posted by the city as an approved dump site.

Okhuysen appealed his conviction to circuit court.

¶5. After Okhuysen appealed his conviction, the City sent him a new letter, again alleging in general terms that his property was in violation of section 94-27(d) of the City Code. This letter again stated that Okhuysen had ten days to bring the property into compliance with the Code and warned that a failure to do so could result in a summons to appear in municipal court and fines, penalties, and other assessments. The letter was largely identical to the letter that the City sent Okhuysen in January 2019 but added the following: "also, subject for 21-19-11 of the City's Code of Ordinances." This addition was actually an inaccurate reference to Mississippi Code Annotated section 21-19-11(1), which authorizes a municipal governing authority to hold a hearing and adjudicate a property "to be a menace to the public health, safety and welfare of the community." Under the statute, if the property is deemed a public menace, and "if the owner does not [clean the land] himself," then the city "shall proceed to clean the land, by the use of municipal employees or by contract." *Id.* Thereafter, the city may "adjudicate the actual cost of cleaning the property and may also impose a penalty not to exceed [$1,500] or fifty percent . . . of the actual cost, whichever is more." *Id.* "The cost and any penalty may become a civil debt against the property owner, and/or, at the option of the governing authority, an assessment against the property." *Id.*

¶6. On September 6, 2019, Okhuysen's attorney wrote to the City requesting a detailed list of the issues that needed to be remedied. He asserted that without such detail, Okhuysen could only "guess" as to the alleged violations of the City Code. On September 11, 2019, the City's Community Development Director, Simon Kim, responded with a letter that included

4

a series of photographs depicting the alleged violations. These included photos of an abandoned truck and other debris, junk, scrap materials, and construction materials scattered throughout the yard. The letter also included photos of poison ivy and what Kim perceived to be "excessive growth of weeds and other noxious plants on the land." The letter also stated that the property was "infested with chiggers, mosquitoes, and other harmful insects." In a footnote the letter stated, "This property may be a subject for [Mississippi Code Annotated section] 21-19-11. However, the City is not intending to utilize this instrument at this time through this letter."

¶7. At the October 1, 2019 meeting of the City's Board of Aldermen, Kim recommended that the Board set a public hearing under section 21-19-11 to determine whether Okhuysen's property was a public menace. The Board adopted Kim's recommendation and set the matter for a public hearing before the Board on November 5, 2019. The City posted notice of the hearing at the subject property and at City Hall and sent notice to Okhuysen and his attorney by certified mail.

¶8. Okhuysen and his attorney appeared at the November 5 meeting of the Board of Aldermen. Kim presented the photos included in his letter to Okhuysen and summarized the alleged Code violations. Kim stated that he believed that the property was a public menace under section 21-19-11.

¶9. Okhuysen's attorney reported that the truck on the property had been repaired and would be moved soon. He also argued that the City had never described the alleged Code violations or the conditions constituting a public menace with sufficient specificity. He

5

stated that despite multiple requests, the City had never given Okhuysen a list of specific actions that needed to be taken to clean up the property. Finally, Okhuysen's attorney argued that Lyles, the code enforcement officer, had violated Article 3, Section 23 of the Mississippi Constitution by trespassing and inspecting the property without a warrant. He argued that "the Mississippi Supreme Court has always said [Section] 23 protects all of your property, not just your house [and] not just your curtilage of your house either." One of the aldermen asked the city attorney whether Lyles lawfully went onto Okhuysen's property. The city attorney stated that in his opinion, Lyles had authority to go onto Okhuysen's property under section 54-107 of the City Code, which states that "the building official or his designees may enter upon private property" to examine vehicles for the purpose of enforcing the Code provisions deeming "junked vehicles" a "public nuisance."

¶10. The Board voted six-to-one to declare the property a menace to the public health, safety, and welfare of the community under section 21-19-11. The Board further directed Kim to give Okhuysen "an additional list specifically defining and enumerating the action[s] the City" would require Okhuysen to take to clean up the property. The Board ordered that Okhuysen would have "until January 5, 2020, to clean the property consistent with the list or the City [would] take steps to clean the property consistent with [section] 21-19-11."

¶11. The following day, Kim sent a letter to Okhuysen. This letter included the same photos and was largely identical to the September 6 letter. However, for each photo and alleged violation, Kim added an instruction to Okhuysen to remove the subject material or vegetation from the property.

6

¶12.    On November 15, 2019, Okhuysen filed a notice of appeal of the Board's decision in the Oktibbeha County Circuit Court.  On appeal in the circuit court, Okhuysen argued that the City violated his right to due process of law by failing to provide sufficient pre-hearing notice of the conditions that allegedly made his property a public menace; that the City violated Article 3, Section 23 of the Mississippi Constitution by trespassing on his property and searching his property without his consent and without a warrant; and that the City failed to prove that his property was a public menace under section 21-19-11.

¶13.    The circuit court affirmed the Board's decision.  The court held that the City complied with the statutory notice requirements and gave Okhuysen sufficient notice of the conditions that made his property a public menace.  In addition, the court held that Lyles did not trespass on Okhuysen's property because the City Code authorized him to go onto the property for purposes of inspection and enforcement.  Finally, the court held that the Board's decision was supported by substantial evidence and was not arbitrary or capricious.  Okhuysen appealed the circuit court's decision, and his appeal was assigned to this Court.

**ANALYSIS**

¶14.    A decision of a municipal governing authority will be reversed if the decision is not supported by substantial evidence, if the decision is arbitrary or capricious, or if the governing authority exceeded its powers or violated a party's constitutional or statutory rights.  *Falco Lime Inc. v. Mayor & Aldermen of City of Vicksburg*, 836 So. 2d 711, 721 (¶42) (Miss. 2002).  We review issues of law de novo.  *Baymeadows LLC v. City of Ridgeland*, 131 So. 3d 1156, 1159 (¶10) (Miss. 2014).

¶15. On appeal, Okhuysen argues that the Board's adjudication of his property as a public menace must be set aside because it was based on evidence obtained in violation of Article 3, Section 23 of the Mississippi Constitution. He argues that Lyles's entry upon and inspection of the property without a warrant or consent violated Section 23. Okhuysen also argues that the Board violated his right to due process of law by not giving him sufficient notice of the conditions that allegedly made his property a public menace, by denying him a "meaningful hearing," and by relying on "un-noticed and/or inapplicable" municipal ordinances as the basis for its adjudication. Finally, he argues that the City failed to prove that his property was a public menace under Mississippi Code Annotated section 21-19-11. For the reasons discussed below, we agree with Okhuysen that the Board's decision must be set aside because it was based on evidence obtained in violation of Section 23 of the Constitution. Because the Board's decision must be reversed for that reason, it is unnecessary to address Okhuysen's remaining issues.

## I. Article 3, Section 23 of the Mississippi Constitution protects all land owned by the person searched.

¶16. Section 23 of the Mississippi Constitution provides,

> The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized.

Miss. Const. art. 3, § 23. Our Supreme Court has held that the protection afforded by Section 23 "is somewhat broader than" the Fourth Amendment to the United States Constitution because Section 23 protects all of the people's "possessions," not just their "papers" and

8

"effects." *Falkner v. State*, 134 Miss. 253, 257, 261, 98 So. 691, 692-93 (1924). "The term 'possessions' is a very comprehensive term, and includes practically everything which may be owned, and over which a person may exercise control." *Id.* at 257, 98 So. at 692. Thus, in *Falkner*, the Court held that a warrantless search of a wooded area about 300 yards from the landowner's residence violated the landowner's rights under Section 23. *Id.* at 256, 262, 98 So. at 691, 693.

¶17. The Court reached a similar conclusion in *Davidson v. State*, 240 So. 2d 463, 463-64 (Miss. 1970). In *Davidson*, a game warden "noticed a tractor parked by an old abandoned house on land belonging to defendant." *Id.* at 463. The game warden went onto the defendant's property to inspect the tractor's serial number and later determined that the tractor was stolen. *Id.* at 463-64. After the defendant was tried and convicted of receiving stolen property, the Supreme Court reversed and rendered the conviction and held that the game warden's search was "illegal" and violated Section 23 because the game warden "committed a trespass when he went upon the [defendant's] lands." *Id.* at 464; *see also Isaacks v. State*, 350 So. 2d 1340, 1341-45 (Miss. 1977) (holding that officers violated Section 23 by searching an open field approximately one-half mile from the defendant's residence without a valid search warrant).

¶18. In *Arnett v. State*, 532 So. 2d 1003 (Miss. 1988), the Court recognized that the United States Supreme Court had held that the protections of the Fourth Amendment are "not extended to the open fields," i.e., areas of a property outside the home and its curtilage.[2] *Id.*

---

[2] "The curtilage of a dwelling is a space necessary and convenient, habitually used for family purposes and for the carrying on of domestic employment; it is the yard, garden

9

at 1009 (quoting *Hester v. United States*, 265 U.S. 57, 59 (1924)). The United States Supreme Court has reasoned that the Fourth Amendment protects "the people in their 'persons, houses, papers, and effects,'" and that the law has long recognized a "distinction between" a person's "house" and surrounding "open fields." *Oliver v. United States*, 466 U.S. 170, 176 (1984) (quoting *Hester*, 265 U.S. at 59). In addition, the United States Supreme Court has concluded that "open fields" are not "'effects' within the meaning of the Fourth Amendment." *Id.* The Court reasoned that "the term 'effects' is less inclusive than 'property'" and that "[t]he Framers would have understood the term 'effects' to be limited to personal, rather than real, property." *Id.* at 177 & n.7. The Court also reasoned that a person has no "reasonable expectation of privacy" in an open field. *Id.* at 177-81.

¶19. In *Arnett*, after discussing the United States Supreme Court's interpretation of the Fourth Amendment, the Mississippi Supreme Court explained that it had interpreted Section 23 of the Mississippi Constitution to provide greater protections. *Arnett*, 532 So. 2d at 1010. The Court had held that Section 23's protections "applied to *all* the land owned by the person searched, and thus far never made any 'open fields' or 'expectation of privacy' distinction." *Id.* at 1010 (emphasis added) (citing *Isaaks*, 350 So. 2d 1340; *Davidson*, 240 So. 2d 1463; *Helton v. State*, 136 Miss. 622, 101 So. 701 (1924)). The Court emphasized that what was

---

or field which is near to and used in connection with the dwelling." *Id.* at 1008 (brackets omitted) (quoting 68 Am. Jur. 2d *Searches and Seizures* § 20 (1973)); *see also United States v. Dunn*, 480 U.S. 294, 301 (1987) (stating that courts generally should consider "four factors" to determine whether an area is within the curtilage of a home: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by").

"significan[t]" in *Davidson* was that the game warden "had committed a 'trespass' in going on the lands of the defendant," not whether the defendant had a "reasonable expectation of privacy" in the particular place where the stolen tractor was parked. *Id.* The Court also noted "the slight difference in wording" between the Fourth Amendment, which uses the phrase "persons, houses, papers, and effects," and Section 23 of our Constitution, which refers more broadly to "persons, houses, and *possessions*." *Id.* at 1010 n.1. After making these points, our Supreme Court stated that it would "reserve further examination of the validity of searches without the curtilage of the home under [Section] 23 of our state Constitution to the case presenting such necessity." *Id.* at 1010.[3]

¶20.    Ten years later, the Court addressed a warrantless search of an area outside the curtilage of a home. *Jordan v. State*, 728 So. 2d 1088, 1095-96 (¶¶27-35) (Miss. 1998). In *Jordan*, the defendant (Jordan) filed a motion to suppress evidence found in a wooded area approximately 100 feet from a trailer in which he had been living for two weeks. *Id.* at 1095 (¶27). Jordan did not own the trailer or the property on which the evidence was found, but he argued that wooded area was within the "curtilage of the trailer" and that he "possessed a Fourth Amendment expectation of privacy in the trailer [and its curtilage] due to his status as a guest." *Id.* at 1095 (¶27) & n.1. However, the trial court "found the wooded area behind

---

[3] In *Arnett*, narcotics officers obtained a search warrant for the defendant's residence "and the curtilage of the residence." *Id.* at 1005. When they executed the warrant, they found 600 pounds of marijuana in a "storm shed" near the defendant's residence. *Id.* at 1006. The defendant argued that the shed was not covered by the warrant because it was outside "the curtilage of the residence." *Id.* However, the Supreme Court held that the shed was within the curtilage of the residence and, hence, covered by the search warrant. *Id.* at 1009. Accordingly, it was unnecessary for the Court to determine whether a search of the shed would have been valid without a warrant. *Id.* at 1010.

the trailer was not part of the curtilage of the trailer and Jordan had no standing to contest the search of the area." *Id.* at 1095 (¶27). Our Supreme Court agreed with the trial court and affirmed. *Id.* at 1095-96 (¶¶27, 35).

¶21. It was necessary for Jordan to show that the area in question was within the curtilage of the trailer because he was a mere guest and did not own the property. *See id.* at 1095 n.1. As a guest, he had an expectation of privacy in the trailer and its curtilage and, hence, standing to object to a search of the curtilage. *Id.* However, Jordan had no standing to object to a search of other areas of the property because, under established Mississippi Supreme Court precedent, "a defendant cannot complain of a trespass on the premises of another." *Corry v. State*, 710 So. 2d 853, 855-56 (¶9) (Miss. 1998); *accord, e.g.*, *Craft v. State*, 254 Miss. 413, 418-19, 181 So. 2d 140, 142 (1965).

¶22. Similarly, in *Tullos v. State*, 287 So. 3d 1014 (Miss. Ct. App. 2019), the defendant (Tullos) challenged a search that had occurred "in a field" on his grandmother's property. *Id.* at 1015-16 (¶¶2-5). Because Tullos did not own the field, he had to show that he had a "reasonable" or "legitimate expectation of privacy" in the place where the search occurred. *Id.* at 1017-18 (¶¶13, 15). This Court held that Tullos had no such expectation of privacy in an open field owned by his grandmother. *Id.* at 1018-19 (¶¶15-18).

¶23. This case is distinguishable from *Arnett* and *Tullos* because Okhuysen owns the subject property. This distinction is critical because Section 23 protects "*all* the land owned by the person searched." *Arnett*, 532 So. 2d at 1010 (emphasis added). Section 23 makes no exception for "open fields." *Id.* Moreover, the "validity of [a] search" under Section 23

12

has "never hinged . . . on whether or not there was a 'reasonable expectation of privacy.'" *Id.* Rather, the primary question under Section 23 is whether the official who conducted the search "committed a 'trespass' in going on the lands of the defendant." *Id.* (citing *Davidson*, 240 So. 2d at 1464).

¶24. In this case, Lyles committed a trespass when he went onto Okhuysen's land. *Id.* A common-law trespass is simply an entry "upon the land of another without a license or other right for one's own purpose." *Thomas v. Harrah's Vicksburg Corp.*, 734 So. 2d 312, 316 (¶10) (Miss. Ct. App. 1999). The requisite intent for a trespass is "an intention to enter upon the particular piece of land in question, irrespective of whether the actor knows or should know that he is not entitled to enter." *Id.* at (¶8) (quoting Restatement (2d) of Torts § 163 cmt. b (1965)). Indeed, "[a] trespass is committed even if the trespasser has a good-faith belief that he has a right to enter the land." *Reeves v. Meridian S. Ry. LLC*, 61 So. 3d 964, 968 (¶19) (Miss. Ct. App. 2011). By going on Okhuysen's land and inspecting the property without Okhuysen's permission or a warrant, Lyles committed a trespass and violated Section 23 of the Constitution.

¶25. Indeed, the trespass in this case was essentially indistinguishable from the trespass in *Davidson*. As discussed above, in *Davidson*, a game warden "noticed a tractor parked by an old abandoned house on land belonging to defendant." *Davidson*, 240 So. 2d at 463. Although he "did not know who owned the land on which the tractor was parked," the game warden walked onto the land, "examined the tractor[,] and made a note of its serial number." *Id.* at 463-64. The Supreme Court held that the game warden's simple act of walking onto

13

the defendant's land was a "trespass"—and, thus, his inspection of the tractor was an "illegal" "search"—because the game warden did not have a warrant or the defendant's permission to enter. *Id.* at 464. Likewise in this case, Lyles trespassed on Okhuysen's land—and, thus, his inspection violated Section 23 of the Constitution—because he did not have a warrant or Okhuysen's permission to enter.[4]

¶26. The City argues that Lyles did not commit a trespass or conduct an unlawful search because municipal ordinances authorized him to enter the property. For example, City Code section 54-107 authorizes a code enforcement officer to "enter upon private property . . . to examine vehicles" in order to enforce Code provisions related to junk vehicles. In addition, section 54-74 provides that an officer "shall be immune from prosecution, civil or criminal, for reasonable, good faith trespass upon property while in the discharge of duties" related to mowing standards and overgrown vegetation. However, a municipal ordinance cannot authorize a search that the Mississippi Constitution prohibits. *Cf. City of Boerne v. Flores*, 521 U.S. 507, 519-20, 529 (1997) (holding that Congress cannot alter the meaning of the Constitution). If the City "could define its own powers by altering the . . . meaning" of the Mississippi Constitution, then "no longer would the Constitution be 'superior paramount law, unchangeable by ordinary means.'" *Id.* at 529 (quoting *Marbury v. Madison*, 5 U.S. (1

---

[4] If this case were governed solely by the Fourth Amendment, Okhuysen likely would not prevail because it would be difficult for him to show that he had any reasonable expectation of privacy in the wooded areas on this property. *See Jordan*, 728 So. 2d at 1095-96 (¶¶27-35). However, as explained above, Section 23 of the Mississippi Constitution and its warrant requirement have been interpreted to protect "*all* the land owned by the person searched"—with no exception for "open fields" and without regard to whether the landowner had an "expectation of privacy." *Arnett*, 532 So. 2d at 1010.

Cranch) 137, 177 (1803)). The validity of a search must be determined based on Section 23 of the Constitution and Mississippi Supreme Court decisions interpreting it, not by reference to municipal ordinances. Therefore, the City's argument that the search was authorized by the City Code is without merit.

## II. Article 3, Section 23 of the Mississippi Constitution prohibits warrantless administrative searches.

¶27. In *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523 (1967), the United States Supreme Court held that the Fourth Amendment's warrant requirement applies to administrative inspections intended to verify compliance with municipal health codes or building codes. *Id.* at 534. The Court rejected the argument that the Fourth Amendment applied only to searches that seek to uncover evidence of a crime. *Id.* at 530-31. Therefore, the Court held that a provision of a municipal housing code authorizing the warrantless entry and inspection of an apartment was unconstitutional and that the apartment's occupant could not be convicted of refusing to consent to a warrantless inspection. *Id.* at 526-28, 540.

¶28. The *Camara* Court recognized that "the facts that would justify an inference of 'probable cause' to make an [administrative] inspection are clearly different from those that would justify such an inference where a criminal investigation has been undertaken." *Id.* at 538 (quoting *Frank v. Maryland*, 359 U.S. 360, 383 (1959) (Douglas, J., dissenting)). The Court stated that in most cases, a warrant to inspect could be issued without establishing "probable cause to believe that a particular dwelling contains violations of the minimum standards prescribed by the code being enforced." *Id.* at 534. The Court held that "routine

15

periodic inspections of all structures" in a geographic area—i.e., "area inspections"—are "reasonable . . . within the meaning of the Fourth Amendment." *Id.* at 535-36. The Court reasoned that because most citizens will consent to such routine inspections, a warrant to enter and inspect a particular dwelling "should normally be sought only after entry is refused." *Id.* at 539. The Court held that if consent to such a routine inspection is refused, "probable cause to issue a warrant to inspect" can be established by showing that "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to [the] particular dwelling." *Id.* at 538.

¶29. The Mississippi Supreme Court followed *Camara* in *Crook v. City of Madison*, 168 So. 3d 930 (Miss. 2015). In *Crook*, the City of Madison had enacted an ordinance, known as the Rental Inspection and Property Licensing Act (RIPLA), that required landlords to obtain a license for each unit of rental property. *Id.* at 931 (¶1). To obtain a license, the landlord was required to give advance consent to allow the city building inspector to make inspections of the property "when and as needed." *Id.* at 931-33 (¶¶1, 5-6). A landlord (Crook) was convicted in municipal court and again in county court of two counts of renting a property without a license, a misdemeanor, and ordered to pay a fine of $300 on each count. *Id.* at 931-32 (¶¶1, 4). On appeal, Crook argued that RIPLA's advance-consent requirement violated the Fourth Amendment. *Id.* at 932 (¶2). The Supreme Court agreed that RIPLA was unconstitutional because it required the landowner to give advance consent to searches and authorized a judge to issue a warrant without probable cause. *Id.* at 938-39 (¶25). The Court reversed Crook's convictions for renting property without a license because RIPLA

16

unconstitutionally conditioned the license on Crook's advance consent to a search of his property. *Id.* at 939-40 (¶29).

¶30. Based on the Supreme Court's decision in *Crook*, we conclude that Section 23's warrant requirement applies to administrative inspections such as the one at issue in this case. The majority opinion in *Crook* focused on the Fourth Amendment and did not mention Section 23. However, based on the Mississippi Supreme Court's statements that Section 23 generally "provides greater protections" than the Fourth Amendment,[5] there is no reason to believe that the Supreme Court would interpret Section 23 more narrowly than the Fourth Amendment with respect to this particular issue. Accordingly, we hold that a warrant was required for the search conducted in this case.

¶31. The City argues that *Crook* and *Camara* are distinguishable because "Okhuysen was not subject to a criminal penalty or criminal sanctions pursuant to [Mississippi Code Annotated section] 21-19-11" and because this is a "civil proceeding." However, the fact that criminal penalties or sanctions have not been imposed in this particular proceeding is not relevant to the question whether the search itself violated Section 23.[6] The City never requested Okhuysen's consent to the search, and he would have been subject to prosecution

---

[5] *Buford v. State*, 323 So. 3d 500, 504 (¶10) (Miss. 2021) ("Section 23 of the Mississippi Constitution provides greater protections to our citizens than those found within the United States Constitution." (quoting *Graves v. State*, 708 So. 2d 858, 861 (Miss. 1997))); *see also Arnett*, 532 So. 2d at 1010 & n.1; *Falkner*, 134 Miss. at 261, 98 So. at 693.

[6] As noted above, Okhuysen *was* convicted of a misdemeanor and fined in the related case that the City brought against him in municipal court. Okhuysen appealed his conviction to circuit court. The case was still pending in circuit court at the time of the public hearing before the Board of Aldermen. The record in this case does not reflect any subsequent developments in that case.

17

if he had refused to allow a code inspector to enter his property.[7] Under *Crook* and *Davidson*, the search was unconstitutional because it was conducted without a warrant and without Okhuysen's consent.

¶32. Whether the exclusion of evidence is an appropriate remedy for the constitutional violation is a separate question, which we address in Part IV of this opinion. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) ("Whether evidence . . . should be excluded at trial . . . is a remedial question separate from the existence vel non of the constitutional violation."). The fact that this is a civil case may be relevant to that issue. But the warrantless search of Okhuysen's property violated Section 23 of the Constitution regardless of what later proceedings grew out of the search, what evidence was obtained during the search, or what subsequent use was made of that evidence. *Id.* ("[The Fourth Amendment] prohibits unreasonable searches and seizures whether or not the evidence is sought to be used in a criminal trial, and a violation of the Amendment is fully accomplished at the time of an unreasonable governmental intrusion." (quotation marks omitted)).

## III. The "plain view" doctrine is inapplicable.

¶33. The dissent seeks to justify the search based on the "plain view" doctrine. But the City has not made this argument—either before the Board of Aldermen, in the circuit court,

---

[7] Section 54-74 of the City Code provides that "[n]o person shall oppose, obstruct or resist any code inspector or any person authorized by the code enforcement inspector in the discharge of his duties as provided in this division." Section 1-10 provides that "[w]henever in this Code or in any ordinance of the city an act is prohibited or is made or declared to be unlawful or an offense or a misdemeanor, . . . and no specific penalty is provided therefor, the violation of any such provision or the failure to perform any such act shall be punished by a fine not exceeding $1,000.00 or by imprisonment not to exceed 90 days, or both such fine and imprisonment, in the discretion of the court."

18

or in its principal brief or supplemental brief in this Court. We have stated many times that we "will not consider arguments not briefed on appeal." *Neely v. Neely*, 305 So. 3d 164, 174 (¶41) (Miss. Ct. App. 2020), *cert. denied*, 304 So. 3d 1123 (Miss. 2020). As the Supreme Court has explained, "we decline to address an issue that has not been briefed on appeal" because, "[s]imply put, we will not act as an advocate for one party to an appeal." *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 519 (¶27) (Miss. 2018). "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). The dissent offers no reason why we should abandon this well-settled rule in this case to make an argument that the City has never even mentioned.

¶34. Moreover, there is no evidence to support the dissent's new plain-view argument. The plain view doctrine holds that "no warrant is required to seize an object in plain view when viewed by an officer from a place he has the lawful right to be, its incriminating character is readily apparent and the officer has a lawful right of access to the evidence." *Johnson v. State*, 999 So. 2d 360, 364 (¶18) (Miss. 2008) (quoting *McKee v. State*, 878 So. 2d 232, 236 (¶9) (Miss. Ct. App. 2004)). The dissent asserts that the doctrine applies in this case because

> the Code violations Lyles initially went to look at and inspect appear from the photographs in the record to be open, obvious, and in plain view from outside the unfenced property (particularly in the late fall and winter prior to the photos being taken in January 2019)—namely, an abandoned truck, junk, scrap metal, and construction materials scattered around the property with overgrown vegetation.

*Post* at ¶55. The record simply does not support this assertion. The only photo in the record

that clearly was taken from outside the property suggests that little of the property is visible from Garrard Road because the property is wooded and fronted by trees. There is one other photo in the record that was taken from either outside or just inside the property. But that photo only shows a truck *of some sort* at a distance. From that vantage point, there was no way for Lyles or anyone else to determine that the truck was a "junked vehicle" within the meaning of the City's ordinance. In other words, the "incriminating character" of the truck was not "readily apparent" from outside the property. *Johnson*, 999 So. 2d at 364 (¶18). Moreover, the remaining photos in the record were taken from inside Okhuysen's property—where Lyles had no "lawful right to be" without a warrant. *Id.* Hence, the plain view doctrine is inapplicable. *Id.* Put simply, the dissent's claim that a variety of Code violations were "in plain view" from outside the property is pure speculation unsupported by anything in the record.

¶35. In addition, at the hearing before the Board of Aldermen, Okhuysen's attorney specifically represented to the Board that none of the allegedly menacing conditions on the property could be seen from Garrard Road or adjacent private property. Counsel stated that all that could be seen from outside the property was a truck parked near the house. Simon Kim—the City's Community Development Director, who presented the request to declare the property a public menace—did not dispute counsel's representations or offer any contrary evidence. Given the City's failure to dispute this point, it would be exceptionally unfair to now make a contrary finding against Okhuysen on appeal—especially a finding based on speculation, not evidence. To do so would not be an exercise of appellate review but a pure

20

and simple appellate ambush.[8]

¶36.    In material respects, this case is no different from *Davidson*, where a game warden "noticed a tractor parked by an old abandoned house on land belonging to [the] defendant" and then "stopped his car, walked on [the] defendant's land, examined the tractor and made a note of its serial number." *Davidson*, 240 So. 2d at 463-64.  Although the warden could see a tractor near an abandoned house on the defendant's land, the Supreme Court held that he was required to obtain a warrant before he entered the property because nothing about the tractor suggested it was stolen. *Id.* at 464.  Likewise in this case, Lyles may have been able to see a truck of some sort from outside Okhuysen's property, but the mere sight of a truck did not justify his warrantless entry onto the property.

¶37.    We also note that by itself, this one photo of the truck could not have justified the Board's finding that the property was "in such a state of uncleanliness as to be a menace to the public health, safety and welfare of the community." Miss. Code Ann. § 21-19-11(1). The photo shows only that there was a truck of some sort parked on the property.

¶38.    In summary, for all the reasons discussed above, the dissent's new plain-view argument is not properly before this Court and simply lacks support in the record.

### IV.    The Board of Alderman improperly relied on evidence obtained in violation of Article 3, Section 23 of the Mississippi Constitution.

---

[8] *Cf. Sanders v. State*, 678 So. 2d 663, 669-70 (Miss. 1996) (explaining that the Court "will not consider issues raised for the first time in an appellant's reply brief" because "[a]ppellants cannot be allowed to ambush appellees in their [r]ebuttal [b]riefs, thereby denying the appellee an opportunity to respond to the appellant's arguments"); *Triplett v. State*, 264 So. 3d 808, 816 (¶¶27-28) (Miss. Ct. App. 2018) (explaining that "we do not address issues that were not raised at trial" because it deprives the parties of an opportunity to make a record on those issues).

21

¶39.   In *United States v. Janis*, 428 U.S. 433 (1976), a federal civil tax case, the United States Supreme Court stated that it had "never . . . applied [the exclusionary rule] to exclude evidence from a civil proceeding." *Id.* at 447.  However, the Court noted that it had held that the exclusionary rule applied in forfeiture proceedings, which it deemed "quasi-criminal." *Id.* at 447 n.17 (discussing *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693 (1965)). Moreover, the Court also stated that a series of "seminal cases" decided by lower federal courts had applied the exclusionary rule in civil "cases in which the officer committing the unconstitutional search or seizure was an agent of the sovereign that sought to use the evidence." *Id.* at 455-56.

¶40.   The issue before the Court in *Janis* was whether evidence should be excluded from a federal civil tax case on the ground that a state law enforcement officer (i.e., "a criminal law enforcement agent of another sovereign") obtained the evidence in violation of the Fourth Amendment. *Id.* at 434, 459-60.  The Supreme Court held that the exclusionary rule should not be applied in such a case. *Id.* at 457-60.  The Court reasoned that exclusion of the illegally obtained evidence from all criminal trials would be sufficient to achieve the deterrent purpose of the exclusionary rule. *Id.* at 457-58.  The Court further reasoned that the connection between the state law enforcement officer and the federal civil tax case was too attenuated for the exclusionary rule "to provide significant, much less substantial, additional deterrence." *Id.* at 458.  Based on these considerations, the Court held that the "exclusionary rule should not be extended to forbid the use in the civil proceeding of one sovereign of evidence seized by a criminal law enforcement agent of another sovereign." *Id.*

at 459-60. In *Janis*, the Court did not decide whether the exclusionary rule would apply in civil cases (such as the present case) in which a governmental entity seeks to use evidence unconstitutionally obtained by its own agents. *Id.* at 455 & n.31.

¶41. In *Hughes v. Tupelo Oil Co.*, 510 So. 2d 502 (Miss. 1987), the Mississippi Supreme Court considered whether the exclusionary rule should be applied in a wrongful death suit involving only private parties. *Id.* at 505. In *Hughes*, the decedent was killed when he ran into the path of an eighteen-wheel truck on a highway, and his mother sued the truck driver and the driver's employer. *Id.* at 504. At trial, the defendants sought to prove that the decedent had committed suicide by deliberating running into the truck's path. *Id.* As part of their defense, they attempted to introduce evidence that a blood-alcohol test ordered by a highway patrol officer showed that the decedent's blood-alcohol content was .15%. *Id.* at 505.[9] On appeal, the Supreme Court considered whether the trial judge properly excluded that evidence on the ground that the officer lacked authority to order the test under applicable statutes. *Id.* The Court discussed *Janis*'s reasoning that the deterrent effect of applying the exclusionary rule should be balanced "against the societal costs of excluding relevant and reliable evidence." *Id.* The Court concluded that the "exclusion of [the] relevant evidence would have no deterrent effect, since the parties penalized would be [the truck driver and his employer], rather than the officer who ordered the unauthorized test." *Id.* Accordingly, the Court held that the exclusionary rule did not apply in that case. *Id.* However, the Court

---

[9] The defendants also offered evidence that the decedent had attempted suicide in a similar manner only two to three months prior to his death and had expressed suicidal thoughts shortly before his death. *Id.* at 504-05.

further stated, "We make no determination of the admissibility of evidence obtained through the wrongful acts of the party seeking its admission, nor do we retreat from our holding that evidence seized by the State in violation of the state and federal constitutions is inadmissible in quasi-criminal proceedings." *Id.* (citing *State, for Use of Kemper Cnty. v. Brown*, 219 Miss. 383, 68 So. 2d 419 (1953)).[10]

¶42.    Subsequently, in *Accu-Fab & Construction Inc. v. Ladner ex rel. Ladner*, 970 So. 2d 1276, 1283-84 (¶¶20-24) (Miss. Ct. App. 2000), *aff'd*, 778 So. 2d 766 (Miss. 2001),[11] this Court addressed the question that the Supreme Court left open in *Hughes*. *Accu-Fab* was also a wrongful death suit involving only private parties. *Id.* at 1278 (¶¶3-4). In that case, a construction worker died of injuries he sustained when he fell through a roof on a work site. *Id.* After he was taken to the hospital, a urine sample was collected to screen for drugs, and he tested positive for marijuana. *Id.* at 1283 (¶¶20-21). The test was not done for purposes of providing treatment but rather was based on an agreement between the hospital and the general contractor to conduct drug tests on the general contractor's employees. *Id.* at (¶21). The general contractor required its own employees to give prior written consent to such drug tests, but the decedent was not an employee of the general contractor and had never consented to a drug test. *Id.* At trial, the defendants—the general contractor and a

---

[10] In *Brown*, the Court applied the exclusionary rule in a forfeiture proceeding involving a car used to transport whiskey. *Brown*, 219 Miss. at 386-87, 68 So. 2d at 419-20. More recently, our Supreme Court again applied the exclusionary rule in a civil forfeiture action in *State ex rel. Mississippi Bureau of Narcotics v. Canada*, 164 So. 3d 1003, 1006-09 (¶¶10-20) (Miss. 2015).

[11] The Supreme Court's decision in *Accu-Fab* was later overruled on unrelated grounds in *Mack Trucks Inc. v. Tackett*, 841 So. 2d 1107, 1114-15 (¶¶27-28) (Miss. 2003).

subcontractor—attempted to introduce the drug test results as evidence that the decedent contributed to his own injuries. *Id.* at (¶20). But the trial judge excluded the evidence, and this Court affirmed on appeal. *Id.* This Court stated that "the question specifically not answered by the [S]upreme [C]ourt in *Hughes* is squarely presented here." *Id.* at 1284 (¶24). This Court then held that evidence should be excluded in a civil case if it was "obtained through the wrongful acts of the party seeking its admission." *Id.* at 1284 (¶¶23-24) (quoting *Hughes*, 510 So. 2d at 505). In addition, this Court held that the trial judge properly excluded the drug test results because neither the general contractor nor the subcontractor "had authority to draw samples, nor to order samples drawn of bodily fluids from the decedent for testing purposes." *Id.*[12]

¶43. The Mississippi Supreme Court granted certiorari in *Accu-Fab* and affirmed this Court's decision, but it affirmed the exclusion of drug test results on other grounds. *Accu-Fab*, 778 So. 2d at 771-72 (¶22-25). The Supreme Court held that the trial judge properly excluded the evidence because "there was no evidence that [the decedent] was impaired at the time of [the] incident," and no "foundation [was] laid to demonstrate that the drug

---

[12] In dissent, Chief Judge McMillin argued that the drug test results should have been admitted because there was no evidence of wrongdoing by either defendant. *Accu-Fab*, 970 So. 2d at 1289 (¶¶53-54) (McMillin, C.J., joined by Southwick, P.J., dissenting). In his view, the record showed only that the hospital conducted the drug test under the mistaken assumption that the decedent was an employee of the general contractor, and there was no evidence that either defendant made any misrepresentations to the hospital. *Id.* In addition, in an opinion concurring in part and dissenting in part, Judge Irving "agree[d] with the majority that misconduct on the part of the proponent of the evidence in obtaining the evidence should preclude its admission." *Id.* at 1291 (¶62) (Irving, J., joined by King, P.J., concurring in part and dissenting in part). However, Judge Irving also agreed with Judge McMillin that there was insufficient evidence to support a finding of wrongdoing by either defendant. *Id.*

25

concentration was sufficient to impair [his] mental and motor skills to even the slightest degree." *Id.* at 772 (¶23). The Court concluded that in the absence of such evidence, the drug tests results would be highly prejudicial and would have no probative value. *Id.* at (¶¶24-25). Because the Supreme Court held that the evidence was properly excluded for those reasons, it did not address this Court's holding that the test results were inadmissible because they were wrongfully obtained. *See id.* at 771-72 (¶¶22-25).

¶44. Thus, in *Accu-Fab*, this Court held that evidence should be excluded in a civil case if it was "obtained through the wrongful acts of the party seeking its admission." *Accu-Fab*, 970 So. 2d at 1284 (¶¶23-24) (quoting *Hughes*, 510 So. 2d at 505). Indeed, the dissent and partial dissent in *Accu-Fab* did not dispute that proposition as a matter of law; rather, they questioned only the factual premise that the defendants had engaged in any wrongful conduct. *See supra* note 12. In addition, the Mississippi Supreme Court did not disturb or criticize this Court's holding on this issue but rather decided that the drug test results were inadmissible for other reasons. *Accu-Fab*, 778 So. 2d at 771-72 (¶22-25). Thus, this Court's holding in *Accu-Fab* remains good law on this point. Accordingly, in this case, evidence that the City obtained in violation of Okhuysen's rights under Section 23 of the Mississippi Constitution should not have been admissible and used against Okhuysen.[13]

¶45. Even if this Court had not addressed the issue in *Accu-Fab*, we would conclude that

---

[13] In holding that the exclusionary rule applies in this case, we do not suggest that Lyles's warrantless inspection of the property was "wrongful" in the sense that he had an evil motive or malicious intent. *Accu-Fab*, 970 So. 2d at 1284 (¶¶23-24) (quoting *Hughes*, 510 So. 2d at 505). We simply hold that the evidence was wrongfully obtained in the sense that it was obtained in violation of Section 23 of the Constitution.

26

the exclusionary rule should be applied in a case such as this one, where the City has initiated a statutory proceeding against a citizen based on evidence that the City's own code enforcement officer obtained in violation of the Mississippi Constitution. In *Janis*, the United States Supreme Court reasoned that the exclusionary rule would have little, if any, deterrent effect because there was only a "highly attenuated" connection between the local police officers who unlawfully obtained the evidence and the federal civil tax proceeding in which the evidence was used. *Janis*, 428 U.S. at 457-58. The Supreme Court recognized that a different question would be presented if federal agents had conducted or participated in the search in any way. *Id.* at 455 & n.31. Unlike *Janis*, this is a case initiated by the same city department that conducted the unconstitutional search. Indeed, the same city department initiated both civil and criminal actions against Okhuysen, both based on the same unconstitutional search and the same alleged conditions on Okhuysen's property. The exclusionary rule should be applied in this proceeding because there is a clear and direct connection between the unconstitutional search and the proceeding. The City should not have been able to declare Okhuysen's property a public menace based on evidence that the City's own agent obtained in violation of the Mississippi Constitution.[14]

     **V.    The City has never argued that the "good faith" exception to the**

---

[14] The dissent asserts that the exclusion of evidence in this context will not promote the purposes of the exclusionary rule but instead will "likely serve only to deter City Code enforcement inspectors and make them less willing to do their duty." *Post* at ¶63 (quotation marks and brackets omitted). However, our decision does not "deter" anything other than the warrantless entry onto private property without the owner's consent, which is prohibited by Section 23 of the Mississippi Constitution. On the other hand, if we failed to enforce Section 23 in code enforcement proceedings such as this, there would be little incentive for code enforcement officers to comply with the Constitution's warrant requirement.

27

**exclusionary rule applies, so we do not address the issue.**

¶46. The dissent also asserts that the "good faith" exception to the exclusionary rule applies and justifies the Board's decision in this case.[15] However, the City has never mentioned the good faith exception—either in the circuit court or in its principal brief or supplemental brief in this Court. Rather, the City has argued only that the exclusionary rule does not apply because this is a civil case.[16] As noted above, we ordinarily decline to address issues that the parties themselves have not raised or briefed. *See supra* ¶33 & n.8. There is no reason for us to depart from that rule here. Indeed, in this case, there are good reasons to apply our rule against raising and deciding issues sua sponte. In *Eaddy v. State*, 63 So. 3d 1209 (Miss. 2011), our Supreme Court stated that it had "no duty to address . . . the good-faith exception" because "the State's brief [did] not address [the] Court's precedent on that exception." *Id.* at 1214-15 (¶¶21-22). A number of other courts have similarly held that the government

---

[15] In *United States v. Leon*, 468 U.S. 897, 922-23 (1984), the United States Supreme Court held that the exclusionary rule does not apply when an officer conducts a search in an objectively reasonable (i.e., "good faith") reliance on a facially valid search warrant issued by a neutral magistrate, even if the warrant is later found to be invalid. The Mississippi Supreme Court subsequently adopted "the *Leon* good faith exception." *White v. State*, 842 So. 2d 565, 572 (¶¶19-20) (Miss. 2003) (holding that the exception applied to evidence obtained by an officer who relied in good faith on a telephonic search warrant that was later declared invalid).

[16] The dissent asserts that "the City essentially asserted in its supplemental brief that such an exception should apply by pointing out that Lyles's conduct was authorized by the applicable ordinances . . . ." *Post* at n.22. We respectfully disagree. Although the City quoted an ordinance that contains the phrase "good faith," the City has never mentioned the good faith exception to the exclusionary rule nor discussed any relevant caselaw applying that exception to the exclusionary rule.

28

waives the good faith exception when it fails to raise and brief the issue.[17] As the Nebraska

Supreme Court put it, "requiring the State to raise the good faith issue at the appellate level

does not place an onerous burden on the State," and "the State's failure to present the good

faith theory deprives [the opposing party] of the opportunity to respond." *Tompkins*, 723

N.W.2d at 349. Moreover, it is unclear how the good faith exception would apply in this

case,[18] and neither party has had the opportunity to address the issue because the City did not

raise it. For these reasons, we decline to address the potential applicability of the good faith

exception to a situation such as this.

> **VI.    The Board's decision declaring Okhuysen's property a public menace must be reversed and rendered.**

¶47.    The Board's decision to declare Okhuysen's property a public menace was based on

evidence (photographs) obtained by the City in violation of Okhuysen's rights under Section

23 of the Mississippi Constitution. The City should not have been able to use that evidence

against Okhuysen in this civil proceeding, and therefore the Board's decision declaring

Okhuysen's property a public menace cannot stand.

## CONCLUSION

¶48.    Article 3, Section 23 of the Mississippi Constitution protects the entirety of

---

[17] *See, e.g.*, *United States v. Lara*, 815 F.3d 605, 612-13 (9th Cir. 2016); *United States v. Wurie*, 728 F.3d 1, 13-14 (1st Cir. 2013); *United States v. Ford*, 184 F.3d 566, 578 n.3 (6th Cir. 1999); *State v. Tompkins*, 723 N.W.2d 344, 347-49 (Neb. 2006); *State v. Hicks*, 147 P.3d 1076, 1089 (Kan. 2006).

[18] *See Eaddy*, 63 So. 3d at 1215 (¶24) (stating that the Mississippi Supreme Court's decision in "*White* does not sanction the good-faith exception where the officer is mistaken about the suspect's general right to be free from unreasonable searches").

Okhuysen's property, not just the house and curtilage. *Arnett*, 532 So. 2d at 1010. Post-*Arnett*, the Mississippi Supreme Court has not altered or overruled any of its prior precedents under Section 23. Therefore, we are bound to hold that the warrantless search of Okhuysen's property without his consent violated Section 23. We also hold that Section 23 applies to administrative searches such as the inspection conducted by the code enforcement officer in this case. *Crook*, 168 So. 3d at 935-36 (¶17). Finally, we hold that the exclusionary rule applies in a proceeding such as this. This case was initiated by the same department of the same governmental entity that conducted the unconstitutional search. Thus, there is a direct connection between the unconstitutional search and the attempted use of the evidence. Moreover, although this proceeding is civil in nature, the statute under which it is brought authorizes the City to assess a penalty, and the City also initiated parallel criminal proceedings based on the same search. Under these circumstances, we hold that the City may not use evidence that it obtained from the unconstitutional search. Without the unconstitutionally obtained evidence, the decision of the Board of Alderman declaring Okhuysen's property a public menace under Mississippi Code Annotated section 21-19-11 cannot stand. Accordingly, the judgment of the circuit court and the decision of the Board must be reversed and rendered in favor of Okhuysen.

¶49. Our holdings in this case should not impose any significant burden on cities. A city may enforce its ordinances or initiate proceedings under section 21-19-11 based on any conditions on a property that can be observed from a public street or from the property of an adjacent landowner who has given consent. *Cf., e.g.*, *Hartfield v. State*, 209 Miss. 787, 793,

30

48 So. 2d 507, 508-09 (1950) (explaining that an officer does not violate Section 23 simply by making observations from "a place he has a right to be—such as a public place"). In addition, "most citizens [will] allow inspections of their property without a warrant." *Camara*, 387 U.S. at 539. If consent is refused, a warrant may be obtained by showing that a search is part of a routine "area inspection" defined by "reasonable legislative or administrative standards." *Crook*, 168 So. 3d at 936 (¶18) (quoting *Camara*, 387 U.S. at 538). Alternatively, a warrant may be obtained "upon a showing . . . that probable cause exists to believe that a zoning violation will be discovered upon inspection of the premises." *Town of Bozrah v. Chmurynski*, 36 A.3d 210, 215 (Conn. 2012) (discussing the showing required for a warrant when "the proposed search is not part of a periodic or area inspection program"). In any event, this is not a new requirement, as both *Camara* and *Crook* previously established that a warrant is required for an administrative search. *Camara*, 387 U.S. at 534; *Crook*, 168 So. 3d at 935-36 (¶17). The search in this case was conducted without a warrant, and therefore the Board's decision and the judgment of the circuit court must be reversed and rendered.

¶50. **REVERSED AND RENDERED.**

**GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. BARNES, C.J., NOT PARTICIPATING.**

**CARLTON, P.J., DISSENTING:**

¶51. I dissent because I find no error in the Board's relying on the evidence obtained by City Code Inspector Lyles in adjudicating Okhuysen's property to be a "menace to the public

health, safety and welfare of the community." Miss. Code Ann. § 21-19-11(1) (Supp. 2018). As the majority acknowledges, a municipality's decision will not be reversed by this Court "unless [the municipality's] decision is arbitrary, capricious, discriminatory, or is illegal, or without a substantial evidentiary basis." *Baymeadows LLC v. City of Ridgeland*, 131 So. 3d 1156, 1159 (¶10) (Miss. 2014). In accordance with this standard of review, I find that the City had substantial evidence before it in support of its determination. I would therefore affirm the circuit court's order affirming the Board's decision and dismissing Okhuysen's appeal.[19]

¶52. The majority finds that the Board's decision "must be set aside because it was based on evidence obtained in violation of Section 23 of the [Mississippi] Constitution." Maj. Op. at ¶15. I respectfully dissent. As detailed below, I find that the evidence Lyles obtained should not be subject to the exclusionary rule in this civil proceeding. Further, even if it were, the evidence should be excepted from the exclusionary rule under the circumstances present here.

¶53. The purpose of section 21-19-11 is to protect the community from property "in such a state of uncleanliness as to be a menace to the public health, safety[,] and welfare of the community" and to provide a means for cleaning up the property. Miss. Code Ann. § 21-19-11. The statute is enforced through a civil proceeding, and the costs allowed by the statute become either a "civil debt" or "tax lien" against the property. *Id.* The statute imposes no criminal sanctions.

---

[19] I find the other assignments of error Okhuysen raises on appeal are without merit.

¶54.   Detailed city ordinances have been promulgated relating to nuisance abatement, including the investigation and clean-up of property as described in section 21-19-11.  City Code section 54-75 specifically "authoriz[es] and empower[s]" code enforcement inspectors "to identify violations of this division," and, as the majority recognizes, "section 54-107 authorizes a code enforcement officer to 'enter upon private property . . . to examine vehicles' in order to enforce Code provisions related to junk vehicles."  Maj. Op. at ¶26.  Additionally, City Code section 54-74 provides that an inspector "shall be immune from prosecution, civil or criminal, for reasonable, good faith trespass upon property while in the discharge of duties" under the nuisance provisions.

¶55.   As a resident and property owner in the City of Starkville, Okhuysen is charged with the knowledge of section 21-19-11, the City ordinances, and what constitutes a violation. *See Garrison v. State*, 950 So. 2d 990, 993 (¶7) (Miss. 2006) ("It is a familiar rule that ignorance of the law excuses no one, or that every person is charged with knowledge of the law.").  And in this case, the Code violations Lyles initially went to look at and inspect appear from the photographs in the record to be open, obvious, and in plain view from outside the unfenced property (particularly in the late fall and winter prior to the photos being taken in January 2019)—namely, an abandoned truck, junk, scrap metal, and construction materials scattered around the property with overgrown vegetation.

¶56.   I recognize that Okhuysen asserts that the junk could not be seen from outside the property and that his lawyer made this representation at the hearing before the Board.  But neither Okhuysen, nor any neighbor, testified at the hearing, and the arguments of counsel

are just that—arguments, not evidence. *Long v. Vitkauskas*, 287 So. 3d 171, 178 (¶31) (Miss. 2019) (stating that "argument of counsel does not suffice as evidence when facts are at issue"); *Massey v. Oasis Health & Rehab of Yazoo City LLC*, 269 So. 3d 1242, 1255 (¶35) (Miss. Ct. App. 2018) ("[A]rguments of counsel are not evidence." (quoting *One 1970 Mercury Cougar v. Tunica County*, 115 So. 3d 792, 796 (¶20) (Miss. 2013))). And contrary to the majority's assertion that the City "did not dispute counsel's representations or offer contrary evidence" on this point, Maj. Op. at ¶35, I find that the opposite is true. Namely, the photographs in the record speak for themselves and show a clear line of sight from outside the property into the unfenced property (and the junk on the property) during the late fall and winter when there is little understory or other foliage that may otherwise make it less visible in spring or summer. Okhuysen offered no evidence to rebut this evidence, nor did the Board express any agreement with the representations made by Okhuysen's counsel. Rather, the Board based its decision on the record, which included the photographs. In sum, the Board had substantial evidence before it to support its determination that Okhuysen's property was in violation of section 21-19-11.

¶57.     In reviewing these circumstances, I find that the evidence Lyles obtained should not be subject to the exclusionary rule in this civil proceeding. In *Hughes v. Tupelo Oil Co.*, 510 So. 2d 502, 505 (Miss. 1987), the Mississippi Supreme Court found that the exclusionary rule did not apply to exclude improperly obtained evidence in a civil proceeding. In so holding, the supreme court explicitly stated, "We make no determination of the admissibility of evidence obtained through the wrongful acts of the party seeking its admission[.]" *Id.* To

date, the supreme court has not spoken on this precise issue.

¶58.    To be sure, in *Accu-Fab & Construction Inc. v. Ladner ex rel. Ladner*, 970 So. 2d 1276 (Miss. Ct. App. 2000), involving a civil wrongful-death action, this Court addressed the question left open by the supreme court, namely, the admissibility of evidence in a civil proceeding purportedly obtained by "the wrongful acts of the party seeking its admission." *Id.* at 1283-84 (¶¶23-24) (citing *Hughes*, 510 So. 2d at 505). The Court affirmed the trial court's excluding drug-test evidence as inadmissible based upon its finding that the parties seeking its admission were without "authority to draw samples . . . [or] to order samples drawn of bodily fluids from the decedent for testing purposes." *Id.* at 1284 (¶24).

¶59.    The supreme court granted certiorari and affirmed this Court's decision, but the supreme court did not address whether the exclusionary rule applied to the evidence acquired based upon the purported "wrongful acts" of the parties seeking its admission. *Accu-Fab & Const. Inc. v. Ladner*, 778 So. 2d 766, 771-72 (¶¶22-25) (Miss. 2001), *overruled on other grounds by Mack Trucks Inc. v. Tackett*, 841 So. 2d 1107, 1115 (¶28) (Miss. 2003). Rather, the supreme court affirmed the exclusion of the drug-test results on other grounds. *Id.* Thus, no supreme court decision has applied the exclusionary rule in a civil proceeding, and I find no basis for doing so here.

¶60.    But even if the exclusionary rule were applicable in civil proceedings based upon the "wrongful acts of the party seeking its admission[,]" I find no "wrongful acts" on Lyles's part in obtaining the evidence at issue in this case. Applying the "plain view" doctrine by analogy and the "good faith" exception to the exclusionary rule to the instant case illustrates my point.

¶61.    The "plain view" doctrine is an exception to the warrant requirement and provides that an officer may "seize an object in plain view if the officer can see it from a place he has a lawful right to be, the object's 'incriminating character is readily apparent[,] and the officer has a lawful right of access to the evidence.'" *Hoskins v. State*, 172 So. 3d 1242, 1248 (¶12) (Miss. Ct. App. 2015) (quoting *McKee v. State*, 878 So. 2d 232, 236 (¶9) (Miss. Ct. App. 2004)).   As addressed above, the City Code enforcement inspector obtained the subject photos of objects that were in "plain view" from outside Okhuysen's property, and the "incriminating character" of the abandoned truck, junk, scrap metal, and construction materials on Okhuysen's unfenced property was "readily apparent" from outside the property.

¶62.    As to the third prong of the "plain view" test—the inspector's "lawful right of access" to the evidence—I find that the "good faith" exception to the exclusionary rule applies.  As an initial matter, no Mississippi case has found unconstitutional a warrantless inspection in a "purely civil" proceeding[20] such as this one, especially when the evidence at issue and its incriminating nature were in plain view from outside the defendant's property.[21]  As such,

---

[20] *See* Miss. Att'y Gen. Op., 2004-0173, 2004 WL 1638727, *Miller*, at *1 (June 4, 2004) ("The procedures set out in Section 21-19-11 are purely civil.").

[21] In *Davidson v. State*, 240 So. 2d 463, 463-64 (Miss. 1970), for example, the defendant was convicted of receiving stolen property, namely, a tractor.  The game warden spotted a tractor on the defendant's property, entered the property *to inspect the tractor's serial number* (i.e., the serial number was not visible without the game warden entering the defendant's property), and a warrant was issued to search the defendant's headquarters based on that serial number.  *Id.*  The supreme court found that under these circumstances (not present in the instant case), the game warden committed a trespass when he went upon the defendant's land and obtained the tractor's serial number, and thus, the ensuing search was also illegal.  *Id.* at 464.  *Crook v. City of Madison*, 168 So. 3d 930 (Miss. 2015), concerned the defendant's criminal convictions under the Rental Inspection and Property Licensing Act (RIPLA), *id.* at 931 (¶1), and RIPLA's lack of a valid warrant provision.  *Id.* at 940 (¶30).

Lyles had no reason to know his entry onto Okhuysen's property in such a situation could constitute a trespass. This is particularly true because Lyles entered Okhuysen's property to obtain the photographs "acting in objectively reasonable reliance" on the ordinances authorizing him to do so. *See White v. State*, 842 So. 2d 565, 571 (¶15) (Miss. 2003) (quoting *United States v. Russell*, 960 F.2d 421, 423 (5th Cir. 1992)).

¶63. In short, I find that Lyles's conduct was not "wrongful." On the contrary, the offending junk on Okhuysen's property was in plain view and Lyles entered Okhuysen's property as authorized by the City ordinances allowing him to do so under the defined and limited circumstances present here. Lyles entered Okhuysen's property in order to enforce a statute that was enacted to protect the "public health, safety and welfare of the community," Miss. Code Ann. § 21-19-11, and Okhuysen is charged with the knowledge of the applicable law and what constitutes a violation.[22] I find that to exclude the evidence under these circumstances "will not further the ends of the exclusionary rule in any appreciable way," *White*, 842 So. 2d at 571 (¶14) (quoting *United States v. Leon*, 468 U.S. 897, 920 (1984)), but instead would likely serve only to deter City Code enforcement inspectors and "make

The supreme court held that RIPLA's inspection provisions were unconstitutional, recognizing that "although RIPLA has a warrant provision, that provision allows a warrant to be obtained 'by the terms of the Rental License, lease, or rental agreement,' which is a standard less than probable cause." *Id.* at 932 (¶2). These circumstances are not present in the instant case.

[22] The majority declines to address the "good faith" exception to the exclusionary rule because the City did not raise it. Maj. Op. at ¶46. But the City essentially asserted in its supplemental appellate brief that such an exception should apply by pointing out that Lyles's conduct was authorized by the applicable ordinances and provided Lyles with immunity from "prosecution, civil or criminal, for reasonable, good faith trespass upon property while in the discharge of duties" under the nuisance provisions of City Code section 54-74.

37

[them] less willing to do [their] duty." *Id.* This clearly is not the purpose of the exclusionary rule. For these reasons, I respectfully dissent.